IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     CRIMINAL NO. 10-631 |
| DENNIS NICHOLAS | : |

GOVERNMENT'S SENTENCING MEMORANDUM

I.    FACTS

      Bernadette Nicholas, an independent mortgage broker and the owner/operator of the Nicholas Mortgage Company, Dennis Nicholas, Bernadette Nicholas' husband and business associate, and Kevin McAllister, a commercial loan officer at Wilmington Trust Federal Savings Bank ("Wilmington Trust"), all engaged in a scheme that caused Wilmington Trust to fund more than $30 million in mortgages to clients of the Nicholas Mortgage Company and led to bribes/kickbacks being paid by the Nicholases to McAllister in return for seeing that the mortgages were funded. The scheme was accomplished by Bernadette Nicholas packaging mortgage applications and supporting documentation that misrepresented material facts, among other things, the mortgage applicant's income and assets, their FICO scores, and the true source and amount of down payments. Once mortgage applications and supporting documentation were finalized for presentation to Wilmington Trust, Bernadette Nicholas forged or caused the mortgage applicant's signature to be made on the documents, knowing that the contents of the documents were not true. The Nicholases also caused inflated appraisals of the properties to be mortgaged to be submitted to Wilmington Trust, in order to theoretically support the mortgage amounts. McAllister, who processed all of the loan packages submitted by Bernadette Nicholas,

failed to fulfill his responsibility as a loan officer to Wilmington Trust to scrutinize the mortgage applications and supporting documentation and decline those applications which did not meet Wilmington Trust's criteria because, after Bernadette Nicholas received her mortgage broker's commission at settlement, she and Dennis Nicholas paid McAllister a percentage of each loan that he approved and Wilmington Trust funded.

Bernadette Nicholas and Dennis Nicholas' motivation for engaging in the fraud scheme was clearly financial. Bernadette Nicholas received a mortgage broker's commission equivalent to approximately two to three percent of the total amount of a funded loan at the time of loan settlement. During the years 2004, 2005, and 2006, Bernadette Nicholas received approximately $1.2 million as the result of the loans funded by Wilmington Trust. Once these monies were received by Bernadette Nicholas, the checks or monies were deposited into accounts maintained by Dennis Nicholas, who then wrote checks made payable to Kevin McAllister equivalent to approximately one percent of the amount of the funded loan, the latter representing kickbacks/bribes to McAllister for getting the questionable loans approved and funded. During the years 2004, 2005, and 2006, McAllister received payments totaling $379,075 in kickbacks/bribes from the Nicholases.

In addition, neither Bernadette Nicholas and Dennis Nicholas reported any of the monies that were initially received by the Nicholases and transferred to McAllister on either of their federal income tax returns submitted to the Internal Revenue Service. The Nicholases jointly filed federal income tax returns based solely on the income that Bernadette Nicolas received from the Nicholas Mortgage Company. During the tax years 2004, 2005 and 2006, Bernadette Nicholas received approximately $1.2 million in referral fees from Wilmington Trust.

But, in preparation of the information that the Nicholases intended to provide to their accountant, who finalized and filed their income tax returns, they knowingly failed to provide the accountant with Bernadette Nicholas' actual income. The Nicholases omitted any monies that they initially received at settlements that they then paid to McAllister, as well as any monies that they used to pay toward their adult children's mortgages, rents, car loans, and several other expenses. McAllister and his wife also filed joint federal income tax returns. Accordingly, the financial gains that the Nicholases received by the funding of the deficient loans applications presented to McAllister by Bernadette Nicholas were concealed from Wilmington Trust and the Internal Revenue Service.

Separate and apart from the activities involving Wilmington Trust, Bernadette Nicholas brokered two mortgages for John and Deborah DiSaverio with Malvern Federal Savings Bank ("Malvern Federal"). The purpose of the mortgages was to purchase an apartment building from Wayne Rosen, doing business as ("d/b/a") Sport-Tech Imaging, Inc. Either Bernadette Nicholas or Dennis Nicholas came up with the sale price of the building. Neither of the DiSaverios made an effort to negotiate the price, instead they simply followed the directions given to them by Bernadette Nicholas. Bernadette Nicholas filled out the loan application on behalf of the DiSaverios with false information about their income and altered their income tax return, then submitted the application to Malvern Federal. Before or at the time of settlement, neither Bernadette Nicholas, Dennis Nicholas, nor Wayne Rosen, who engaged in a teleconference in advance of the settlement and knew all of the particulars as to the terms of the mortgage and the fact that there would not be a down payment but this would not be disclosed to Malvern Federal, informed Malvern Federal of the false representations made in the loan

application or the actual amount of a second mortgage that was part of the sale of the apartment building from Wayne Rosen to the DiSaverios. They fraudulently led Malvern Federal's loan officers to believe that the DiSaverios were making a $440,000 down payment when, in fact, the entire purchase price of the building was being financed. Dennis Nicholas orchestrated the settlement and dictated the false information that would be contained on the settlement sheet. Dennis Nicholas also presented the DiSaverios with a subordination agreement once the settlement was completed and had the DiSaverios agree to pay Rosen $568,000 in a second mortgage, when only minutes prior during the settlement, Malvern Federal was led to believe that the DiSaverios were obtaining a second mortgage of $128,000; by design, this separate agreement also hid the fact that the DiSaverios were not paying a down payment. Thus, Malvern Federal funded a loan to the DiSaverios in the amount of $1,632,000 based on numerous false representations.

Malvern Federal fell victim to another scheme executed by Bernadette Nicholas, Dennis Nicholas, and Wayne Rosen, when Bernadette Nicholas and Wayne Rosen, d/b/a CINOR, LP, applied for a $3.5 million loan from Malvern Federal to refinance two existing loans for a medical building. The $3.5 million loan was intended to pay off an existing loan that CINOR, LP had at Malvern Federal in the amount of $1,494,823.55 and a $1,583,491.90 loan from Wilmington Trust. In order to facilitate CINOR, LP's ability to obtain the new loan, Bernadette Nicholas, Dennis Nicholas, and Wayne Rosen caused seven bogus leases to be submitted to an appraisal company and Malvern Federal. The leases were purportedly between CINOR, LP and six physicians and Powerweb Technologies, Inc., an energy design and engineering firm, who had contracted to rent space in the building and represented to Malvern Federal that CINOR, LP

had sufficient rents to meet their monthly mortgage obligation.  However, after Malvern Federal funded the $3.5 million loan, it was learned that the leases which CINOR, LP presented to Malvern Federal and which Malvern Federal relied on as cash flow to secure the loan were bogus.  Bernadette Nicholas admitted that she forged signatures on the leases and she and Wayne Rosen admitted that they used the bogus leases in order to deceive Malvern Federal and to obtain the requested loans.  Furthermore, Bernadette Nicholas and Wayne Rosen testified as to Dennis Nicholas' role in this scheme to defraud Malvern Federal.

Based on the foregoing facts and those set forth in additional detail in the Superseding Indictment, Dennis Nicholas was charged with bank fraud, in violation of 18 U.S.C. § 1344 (Counts 1 and 63); loan application fraud, in violation of 18 U.S.C. § 1014 (Counts 2 through 55, and 64 and 65); bank bribery, in violation of 18 U.S.C. § 215(a)(1) (Count 56); and, filing false and fraudulent income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 58 and 59).  Prior to trial, the government moved this Court to dismiss Counts One through Fifty-Five of the Superseding Indictment as to this defendant.  At trial, following the government's case-in-chief, the Court granted the defendant's motion to dismiss Count 58 of the Superseding Indictment.  The jury found Dennis Nicholas guilty of the remaining counts, that is, bank bribery as charged in Count Fifty-Six; bank fraud, as charged in Count Sixty-Three; loan application fraud, as charged in Counts Sixty-Four and Sixty-Five; and, filing false and fraudulent income tax return, as charged in Count Fifty-Nine.

II. SENTENCING CALCULATION

A. Statutory Maximum Sentence

18 U.S.C. § 1344 - Bank Fraud - Count Sixty-Three: 30 years imprisonment, five years supervised release, a $1,000,000 fine, and a $100 special assessment.

18 U.S.C. § 1014 - Loan Application Fraud - Counts Sixty-Four and Sixty-Five: 30 years imprisonment, five years supervised release, a $1,000,000 fine, and a $100 special assessment for each count.

18 U.S.C. § 215 - Bank Bribery - Counts Fifty-Six: 30 years imprisonment, five years supervised release, a $1,000,000 fine, and a $100 special assessment.

26 U.S.C. § 7206(1) - Filing False and Fraudulent Income Tax Return - Count Fifty-Nine: Three years imprisonment, one year supervised release, a $100,000 fine, and a $100 special assessment.

Total: 123 years imprisonment, $4,100,000 fine, five years supervised release, and a $500 special assessment.

B. Sentencing Guidelines

The government agrees with the sentencing guidelines and grouping of the applicable guidelines as determined by the United States Probation Office, finding that Dennis Nicholas' offense level is 30 and that he falls into Criminal History Category I.

The government further agrees with the United States Probation Office that, based on a total adjusted offense level of 30 and a criminal history category I, Dennis Nicholas faces a sentencing range between 97 to 121 months imprisonment. He also faces a maximum fine of $4,100,000.

III. <u>SENTENCING ANALYSIS</u>

   Following <u>United States v. Booker</u>, 543 U.S. 220 (2005), imposing a sentence under the advisory Guidelines is a multi-step process. The sentencing court must initially determine, after making appropriate findings of fact, the applicable Guideline range. The advisory Sentencing Guidelines promote the basic aim of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." <u>Booker</u>, 543 U.S. at 252. In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." <u>Id</u>. at 260 (citations omitted).

   After determining the applicable Guidelines range, the court then considers whether a sentence within that range serves the statutory factors set forth in Section 3553(a) and, if not, select a sentence that does serve those factors. Under the procedure outlined in <u>Gall v. United States</u>, 128 S.Ct. 586, 596-97 (2007), the court must undertake an individualized assessment of the facts of each case in light of the factors delineated in 3553(a). The Supreme Court, however, recognizes that "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [United States Sentencing] Commission or the appeals court." <u>Rita v. United States</u>, 551 U.S. 338, 356 (2007). Accordingly, "while the statute still requires a court to give respectful consideration to the Guidelines, <u>Booker</u> permits the court to tailor the sentence in light of other statutory concerns as

well." Kimbrough v. United States, 128 S.Ct. 558, 569-70 (2007) (citations and quotation omitted).

Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a). The court must select a sentence in light of these factors and all other factors under Section 3553(a), and must adequately explain the rationale for its sentence. Gall, 128 S.Ct. at 597. If the sentencing court, after considering all of these factors, chooses to vary outside the advisory Guideline range, such a variance must be supported by a rationale sufficiently compelling to support the extent of the deviation. Id.

In selecting a sentence outside the advisory Guideline range, the court should first consider whether appropriate grounds for departure exist. The government is unaware of any grounds for departure as to this defendant. For the reasons discussed below, the government

respectfully submits that application of the sentencing factors to Dennis Nicholas' conduct calls for a sentence that would forcefully promote general deterrence against mortgage fraud, bank bribery, and tax fraud.

    A.    <u>The Nature and Circumstances of the Offense</u>

The nature and circumstances of the instant offense are disturbing because the defendant and his co-defendant took advantage of opportunities to deceive both Wilmington Trust and Malvern Federal. The defendant was well aware that his wife, Bernadette Nicholas, was providing false information in location applications submitted to both banks in order to obtain funding of loans. There was absolutely no legitimate reason to make the series of payments to McAllister, absent the nefarious nature of the relationship that was forged between the Nicholases and McAllister. Furthermore, the defendant's keen awareness of the wrongdoings going on with the banks was exemplified in the case of the DiSaverio loan, where the defendant shaped the manner in which Malvern Federal was deceived by shielding from disclosure the fact the DiSaverios were not making any down payment which he and the co-defendants knew would be a deal breaker for Malvern Federal. Dennis Nicholas also came up with the notion that presenting bogus leases to Malvern Federal was the optimal method to obtain the refinancing of the Pennsylvania Avenue medical building and, even after the deceit was discovered by the bank, he continued to argue that the leases were valid.

Dennis Nicholas also played a major role in the tax fraud scheme executed by both him and Bernadette Nicholas. As the Court learned during the trial, all or most of Bernadette Nicholas' earnings were maintained in bank accounts in Dennis Nicholas' name and under his control. When it came time to provide their accountant with the information necessary

to prepare their joint income tax returns, both Bernadette Nicholas and Dennis Nicholas had access to Dennis Nicholas' bank records, particularly the deposits. But, rather than rely on the bank records or even ledgers prepared by Bernadette Nicholas, both Bernadette Nicholas and Dennis Nicholas chose to select what income they would report to the accountant, excluding most of their income.

Given the scale of the defendant's crimes and the consequent impact on numerous individuals and entities calls for a significant punishment.

B.  History and Characteristics of the Defendant

Based on the information provided by the United States Probation Office, it appears that the defendant has a significant history of wrongdoing.

C.  The Need to Afford Adequate Deterrence

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct" must also be considered. 18 U.S.C. § 3553(a)(2)(B). The deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any individual or institution tempted to engage in conduct similar to that of the defendant and his co-defendants. This need for deterrence is especially important for other mortgage brokers, loan officers, and settlement agents who may operate under the mis-impression that they can operate without scrutiny and avoid significant jail terms.

D.  The Need to Avoid Unwarranted Sentence Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities." Here, Dennis Nicholas is not exactly similarly situated to either of his co-defendants. While Bernadette Nicholas was a licensed mortgage broker,

McAllister was a loan officer, the defendant played behind the scene of the Wilmington Trust fraud scheme by emerging for the purpose of paying the kickbacks/bribes.  Similarly, Dennis Nicholas played behind the scene of the Malvern Federal fraud scheme for the most part.  However, he did take charge at the settlement of the DiSaverio loan and showed his import in the fraud scheme involving the Pennsylvania Avenue loan when he argued in favor of the bogus leases, when Bernadette Nicholas and Wayne Rosen remained silent.  Accordingly, the sentence requested by the Government would not generate a cognizable disparity.

IV.     CONCLUSION

        The government submits that Dennis Nicholas' crimes were extremely serious in light of the length, scope, and the breadth and nature of the offenses.  Accordingly, the Court must impose a sentence that reflects this seriousness and the consequent financial impact it had on Wilmington Trust, will promote respect for the law, and will deter others.  Deterring conduct of the nature imposed by the defendant is particularly important, because fraud of this length, scope, and breadth undermines the trust that is essential to the banking and mortgage industry.  A sentence within the guideline range of 97 to 121 months imprisonment will forcefully promote

general and specific deterrence.

                        Respectfully submitted,

                        ZANE DAVID MEMEGER
                        United States Attorney


                        /s/ Anita Eve
                        ANITA EVE
                        Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that a copy of the Government's Sentencing Memorandum has been filed electronically on the Electronic Case Filing system and is available for viewing and downloading from the ECF system, and was served by electronic mail on the following defense counsel:

Mark Wilson, Esquire

/s/ Anita Eve
ANITA EVE
Assistant United States Attorney

DATED: October 18, 2012